IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL EMMETT,                           :     CIVIL ACTION
                                          :     NO. 11-528
          Plaintiff,                      :
                                          :
     v.                                   :
                                          :
KWIK LOK CORPORATION,                     :
                                          :
          Defendant.                      :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                           SEPTEMBER 11, 2012


          Michael Emmett ("Plaintiff") brings this age
discrimination action against his former employer, Kwik Lok
Corporation ("Defendant"). Defendant moved for summary judgment.
For the reasons that follow, the Court will grant Defendant's
Motion for Summary Judgment.


I.   **BACKGROUND**[1]

          Defendant manufactures plastic closures for bakery
goods and other grocery products. Defendant divides its sales
territory in the United States into two regions: the eastern
division and western division. Robertson Decl. ¶ 2. Within each
division, regional sales managers report to either the eastern

---

[1]      The Court states the following facts in the light most
favorable to Plaintiff and draws all reasonable inferences in
Plaintiff's favor.

or western divisional sales managers. Id. The eastern and
western divisional sales managers report to the vice president
of sales. Id. ¶ 3. And the vice president of sales reports to
Kwik Lok President Jerre Paxton. Id. ¶ 4.

On May 24, 1993, Defendant hired Plaintiff as a
regional sales manager for the eastern division. Emmett Dep.
11:9-22, Dec. 16, 2011. Plaintiff was responsible for
Pennsylvania, West Virginia, Virginia, Maryland, Delaware, the
District of Columbia, and parts of New Jersey and Ohio. Id. at
21:13-17. From the time Plaintiff began his employment with
Defendant until 2008, Kevin Ryan directly supervised Plaintiff
as the eastern divisional sales manager. Id. at 11:3-6. On April
1, 2008, Richard Zaremba became eastern divisional sales
manager. Id. at 12:2-4. From January 1, 2005, to the present,
Hal Miller served as the vice president of sales. Robertson
Decl. ¶ 3. When Zaremba became the eastern divisional sales
manager, Miller identified some low-performing regional sales
managers, including Plaintiff, who needed assistance improving
their performance.[2] Miller Dep. 101:2-18, Dec. 21, 2011.

---

[2]      Miller testified that he made the following remarks to
Zaremba after Zaremba became the eastern divisional sales
manager in April 2008:

[W]e need to put some pressure on low performance and
we have Tom Welton has slipped a little bit, he has
gotten older and he has had some health issues, but he

Plaintiff largely bases his claims of unlawful age discrimination on the following three events. First, on April 30, 2008, Zaremba commented during a one-on-one meeting with Plaintiff: "Mike, at fifty-two, I wouldn't want you to get bored in your job. It's hard to find a new job and there's a lot of young guys looking for work." Emmett Dep. 60:20-23. Zaremba's comment shocked Plaintiff because no one had ever made such a comment to him before. Id. at 60:25-61:6. After a period of silence, Zaremba went on to consider other business issues during their meeting. Id. at 61:7-15.

Second, on June 27, 2008, after reviewing complaint procedures with a human resources representative, Plaintiff prepared a written complaint to Miller about Zaremba ("June 27 Complaint Letter") that Plaintiff read to Miller over the telephone. Id. at 86:7-17, 93:19-94, 121:25-122:15; Robertson Dep. 9:15-10:23, Mar. 9, 2012. The June 27 Complaint Letter provided, in part:

---

needs to get his call reports up, his call frequency up.

And I talked to him about the flying to Florida trip and what we need to change there and I told him that Mike Emmett has been a consistent low performer, a complaint by Kevin Ryan since day one and Mike needs some prodding because his performance has been substandard for many, many years. We've got to help him and turn this around.

Miller Dep. 101:7-18.

3

Hal,

I'am [sic] contacting you in reference to, what I consider, inappropriate comments's [sic] by Rich Zaremba. These comments include references to employee age, employment security, outright threats and implied threats. A listing of these comments is being supplied with this memo. These comments have served to create an atmosphere of distrust with Rich.

I'am [sic] coming to you for a resolution to this problem after much soul searching. I have also reviewed my approach to this very important issue with Marsha Robertson to be sure I'am [sic] following company policy. Marsha has assured me that. I'am [sic] proceeding correctly as outlined in the Kwik Lok Corporation Employee Handbook Section 718, Problem Resolution.

Thank you for your consideration of this matter.

Rich Zaremba comments to Mike Emmett:

1.) Divisional Sales Meeting 4/30/08 1 on 1 Meeting w/Rich Zaremba

"Mike, I wouldn't want you to get bored in your job! At 52 its [sic] hard to find a new job there is a lot of young guys looking for work."

. . . .

Additionally, Hal, Rich makes it sound like you are supporting all this and he's just the messenger. The impression he leaves is that you have contempt for each of us. I've known you for fifteen years now and I just do not believe that that is the case!

Sincerely,
Mike Emmett
Regional Sales Manager

June 27 Complaint Letter 1-2, Mot. Summ. J. Ex. G. Plaintiff

testified that after he read the Complaint Letter to Miller over

the telephone, Miller asked Plaintiff, "[J]ust what are you

4

going to do about it?" Emmett Dep. 83:2-4. Plaintiff returned, "[W]ell, Hal, there's really nothing I can do about it. That's why I'm coming to you." Id. at 83:5-6. Miller told Plaintiff to "be a man and handle it with [Zaremba] directly" and that it sounded like Plaintiff was trying "to build a case." Id. at 83:7-9. Plaintiff also testified that Miller admitted he was "trying to send a message" and did not deny Zaremba's April 2008 comment. Id. at 83:14-25. After the telephone conversation with Plaintiff, Miller called Zaremba to inform him that Plaintiff felt intimidated and that Zaremba should address the problem with Plaintiff. Miller Dep. 114:15-115:14.

In July 2008, during an annual sales conference, Plaintiff believed Miller initially avoided Plaintiff. Emmett Dep. 98:5-7. Later that week, however, Plaintiff and Miller met over Plaintiff's complaint. Id. at 98:8-18. Plaintiff told Miller that, "if nothing like this happens again the issue is settled." Id. at 101:11-13. Plaintiff testified that Miller said he felt "terrible about this whole thing," that Miller informed Paxton of Plaintiff's complaint, and that Miller accepted responsibility for the incidents in the complaint. Id. at 101:14-20.

Third, in June 2009, while traveling with Zaremba on a business trip, Zaremba asked Plaintiff, "[H]ow's your health and is your mortgage paid[?]" Plaintiff responded "good and no,"

there was a long silence, and then the two later talked about business. Id. at 73:24-74:8. Plaintiff interpreted Zaremba's questions as a threat because they "would be asked of a person of older age because . . . as we get older sometimes your health issues start to arise, and you have to be a little bit older for your mortgage to be paid." Id. at 71:1-72:5. On prior occasions, Plaintiff had generally discussed mortgages with his coworkers and Plaintiff discussed with his former supervisor Kevin Ryan a panic attack he experienced after a near collision on the highway, which resulted in Plaintiff's hospitalization for one day. Id. at 76:13-78:14.

Defendant offers evidence of instances of unprofessional behavior that ultimately led to Plaintiff's termination. In June or July of 2009, one of Plaintiff's key customers, Procacci Brothers, experienced problems with a new closure and label system Plaintiff sold, which caused the customer to lose a large order. Id. at 140:9-143:25. The customer requested to speak with the president of the company, but because he was not available that day, Plaintiff attempted to reach Miller. Id. at 181:2-9. Before putting the customer on the phone with Miller, Plaintiff gave Miller a short explanation of the background of the problem the customer experienced. Id. at 182:4-183:11. Once on the phone with Miller, the customer told him she lost a big order, described the problems she had

6

with Defendant's product, and asked what Miller would do about the problem. Id. at 183:14-17. Miller testified that the customer "lambasted" him and that it was the responsibility of the regional sales manager, eastern divisional sales manager, and production staff to handle the problem.[3] Id. at 159:10-160:11.

In August 2009, Plaintiff called Plant Manager Dale Crabill after he learned from Zaremba that Crabill shipped out an under-count order to Procacci Brothers. Emmett Dep. 154:19-25. Plaintiff testified that his voice was raised and that Crabill responded that he would fix the problem. Id. at 157:6-20. Crabill called Miller to express his opinion that Plaintiff be fired for insubordination. Crabill Dep. 18:1-24, Jan. 24, 2012. Later that day Zaremba asked Plaintiff to call Crabill again to "smooth things over." Id. 157:21-158:1. Plaintiff called Crabill and ensured that "everything [is] cool on this." Id. at 159:4-5.

Also in August 2009, Plaintiff called Zaremba upset over the under-count shipment to Procacci Brother. Zaremba Dep.

---

[3]     Defendant gave its customers the option to order a target number of closures that Defendant would deliver within a certain margin or to order an exact number of closures that Defendant would deliver for an added ten-percent surcharge. Emmett Dep. 167:9-168:6. The parties dispute whether Defendant agreed to provide Procacci Brothers an exact count after it experienced problems with Defendant's equipment.

70:7-23, Jan. 24, 2012. Zaremba testified that Plaintiff "just

started screaming at me and I literally had to move the phone

out over here (indicating) and just let him vent." Id. at 70:9-

11. Zaremba told Plaintiff he would speak to Crabill. Id. at

71:1-6. Zaremba called Plaintiff back that evening, but

Plaintiff did not answer his phone. Id. at 71:13-20.

On August 27, 2009, Plaintiff sent an e-mail message

to Zaremba and "carbon copies" of the message to Miller and

Crabill. The message expressed Plaintiff's dissatisfaction with

Defendant's policy of completing orders within a certain margin

of closures ordered:

> Gentlemen,
>
> I will be going to meet with Rita [the Procacci
> Brothers representative] either tomorrow Friday 8/28
> or Monday to review the exact details of her recent
> complaint to PS on partial cartons with less than the
> designated 12000 P200 per carton. My understanding per
> J.Schmidt is that one carton was short a roll or two.
>
> When we went through the problems their [sic]
> previously one of the issues was carton count and how
> this relates to the customer controlling inventory and
> recieving [sic] etc. You agreed that 12000/ carton was
> a doable number and that that is what the customer
> could expect and what we would provide. Now we seem to
> be going back on this position, as per your fax
> tonight Rich, of the P200 price list which shows a 10%
> upcharge for accurate counts better than +/- 10%, and
> commenting that PS is aware of this. Does this mean PS
> is some how to blame? The customer requested a
> consistent per carton count and we agreed to it! We
> need to adapt to service our customers [sic] needs and
> in this case the aforementioned is what we needed to
> satisfy the account. It would be impossible to explain

to this customer, or most any others for that matter, that they should expect their order quantities to be filled with in a +/- 10% accuracy only. The +/- 10% quantity counts are not acceptable in todays [sic] marketplace. I wouldnt [sic] live with it if I was buying someones [sic] products! The 10% upcharge for accurate counts needs a serious review.

If the both of you would like the opportunity to explain this to Procacci Bros. I would invite you both to make a trip to Philadelphia and join me at the account and explain to Rita face to face and why you agreed to the 12000/case and why that must now change and why exactly we cant [sic] provide them with an accurate case count.

I have spent 16 years establishing a good business relationship at Procacci Bros for Kwik Loc, hours behind the wheel of a car, hours in traffic jams, hours away from home and my family trying to represent Kwik Lok to the best of my ability. This is the exact kind of situation that ruins all this effort and expenditure of Kwik Lok expenses. Sorry if I sound PO'd but Iam! [sic]

Thank you,
Mike Emmett
Regional Sales Mgr.

Mot. Summ. J. Ex. K.

Miller decided to terminate Plaintiff's employment. On September 3, 2009, Miller drafted a memorandum to Paxton that explained:

The last straw has been drawn. I feel we have done everything possible to create a Team approach. We have Mike who continually disrupts our efforts and seldom supports company policy and adheres to our standards as set forth in procedures manual. He is not a team player or a 'company man[.]' I have made this decision and value your comments and/or your advice.

Id. Ex. L. And on September 4, 2009, Miller sent a letter to
Plaintiff to notify him of his termination. Miller explained
that he made the decision to terminate Plaintiff because he
wrote the August 27 e-mail message in a disrespectful tone,
blamed his coworkers before fully investigating the facts, and
failed to understand and defend company policy. Id. Ex. M.
Plaintiff's termination became effective on September 8, 2009.
Id.

Following Plaintiff's termination, Zaremba interviewed
at least two candidates to replace Plaintiff. Zaremba Dep.
123:23-124:25. Nevertheless, Miller decided not to hire another
regional sales manager in the eastern division but instead to
split Plaintiff's territory with the remaining three regional
sales managers in the eastern division: Phil Pettine (age: 48),
Tom Weldon (age: 59), and Chris Loehman (age: 37).[4] Miller Dep.
128:12-129:10; Robertson Decl. ¶ 7 (providing age of employees
on September 1, 2009). On September 1, 2009, Plaintiff was
fifty-three-years old. Robertson Decl. ¶ 7.


## II.  PROCEDURAL HISTORY

On January 25, 2011, Plaintiff filed a Complaint that
asserts the following claims against Defendant: unlawful age

---

[4]      Loehman received what Plaintiff believes was his most-
significant customer. Emmett Dep. 105:23-106:4.

discrimination in violation of the Age Discrimination in
Employment Act ("ADEA") and the Pennsylvania Human Relations Act
("PHRA") (Counts I and IV); unlawful harassment in violation of
the ADEA and the PHRA (Counts II and V); and unlawful
retaliation in violation of the ADEA and the PHRA (Counts III
and VI). On April 20, 2011, Defendant answered.

On March 31, 2012, Defendant filed the instant Motion
for Summary Judgment. Plaintiff responded. And Defendant moved
for leave to file a reply brief. The Court considered the
briefing and the matter is now ripe for disposition.

**III. LEGAL STANDARD**

Summary judgment is appropriate if there are no
genuine disputes of material fact and the moving party is
entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).
"A motion for summary judgment will not be defeated by 'the mere
existence' of some disputed facts, but will be denied when there
is a genuine issue of material fact." Am. Eagle Outfitters v.
Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A
fact is "material" if proof of its existence or nonexistence
might affect the outcome of the litigation, and a dispute is
"genuine" if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." <u>Pignataro v. Port Auth. of N.Y. & N.J.</u>, 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250.

**IV.  DISCUSSION**

Defendant moves for summary judgment on Plaintiff's claims of unlawful discrimination, retaliation, and harassment. For the reasons that follow, the Court will grant the Motion.

A.  <u>Age Discrimination and Retaliation</u>

Under the ADEA, an employer may not discharge an individual because of his age or discriminate against an individual because he opposed an unlawful employment practice or

participated in a proceeding under the ADEA.[5] See 29 U.S.C. §
623(a)(1), (d) (2006). Absent direct evidence of discrimination,
a plaintiff may prove a claim of unlawful discrimination in
violation of the ADEA under the McDonnell Douglas framework. See
Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009);
Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir.
1995) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792,
802 (1973)). First, Plaintiff must establish a prima facie case
of discrimination. See Smith, 589 F.3d at 691. Defendant rebuts
the presumption of age discrimination raised by a prima facie
case by proffering legitimate, nondiscriminatory reasons for
terminating Plaintiff. See id. Finally, the ultimate burden
rests with Plaintiff to demonstrate that Defendant's proffered
reasons are a pretext and Defendant's true reason for
terminating him was unlawful discrimination or retaliation. See
id. Plaintiff ultimately must prove that Defendant would not
have terminated him but for his age. See Gross v. FBL Fin.

---

[5]      The ADEA's general discrimination prohibition
provides: "It shall be unlawful for an employer . . . to
discharge any individual . . . because of such individual's age
. . . ." 29 U.S.C. § 623(a)(1) (2006). And ADEA's retaliation
provision makes it "unlawful for an employer to discriminate
against any of his employees . . . because such individual . . .
has opposed any practice made unlawful by this section, or
because such individual . . . has made a charge, testified,
assisted, or participated in any manner in an investigation,
proceeding, or litigation under this chapter." Id. § 623(d) The
PHRA prohibits similar conduct. Pa. Cons. Stat. Ann. § 955(a),
(d) (West 2012).

Servs., 557 U.S. 167, 175-78 (2009). The Court follows this
evidentiary framework for unlawful discrimination and
retaliation claims under the ADEA and the PHRA. See Fasold v.
Justice, 409 F.3d 178, 183-84, 188 (3d Cir. 2005); Kautz v. Met-
Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005).

      1.   Prima Facie Case of Unlawful Discrimination and
           Retaliation

        Defendant argues that the evidence of record does not
support a prima facie case of discrimination or retaliation
under the ADEA or the PHRA. For the reasons that follow,
Plaintiff fails to establish a prima facie case of
discrimination or retaliation.

        a.    Discrimination

        To establish a prima facie case for age
discrimination, Plaintiff bears the initial burden to show: (1)
that he is at least forty years of age; (2) that he suffered an
adverse employment action; (3) that he was qualified for his
position; and (4) that Defendant ultimately replaced him with
another employee who was sufficiently younger to support an
inference of discriminatory animus. See, e.g., Smith, 589 F.3d
at 689. Defendant concedes for purposes of summary judgment that
Plaintiff satisfies the first three elements of a prima facie
case. Defendant argues, however, that Plaintiff fails to satisfy

14

the fourth element because his sales territory was consolidated under three regional sales managers whose average age (forty-eight) is not sufficiently younger than Plaintiff's age at the time of his termination (fifty-three).

Plaintiff fails to establish a prima facie case of age discrimination. The elements of a prima facie case are not applied rigidly, and no bright-lined rule regarding what age difference satisfies the fourth element of a prima facie case exists in the Third Circuit. See Fasold, 409 F.3d at 185 n.10; Narin v. Lower Merion Sch. Dist., 206 F.3d 323, 331 (3d Cir. 2000). Here, after Defendant interviewed candidates to replace Plaintiff, Defendant ultimately consolidated Plaintiff's sales territory instead of hiring a new employee. The average age of the remaining regional sales managers in the eastern division was only five years younger than Plaintiff around the time of his termination. Plaintiff argues that his most significant client went to a thirty-seven-year-old sales manager, but this evidence, on its own, is insufficient for a reasonable jury to find Defendant ultimately replaced Plaintiff with someone sufficiently younger to support an inference of discrimination. See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996) (unanimous). Therefore, Plaintiff fails to establish a prima facie case of unlawful age discrimination.

b.     Retaliation

To establish a prima facie case for unlawful retaliation, Plaintiff must show (1) that he engaged in protected activity under the ADEA; (2) that he was subject to an adverse action; and (3) that there is a causal connection between the protected activity and adverse action. See Fasold, 409 F.3d at 188.

Under the ADEA, an employee engages in protected activity either by opposing unlawful age discrimination or participating in proceedings relating to unlawful discrimination. See 29 U.S.C. § 623(d). Plaintiff proceeds under the opposition component of the ADEA's retaliation provision because he alleges that Defendant terminated him in retaliation for his June 27 Complaint Letter to Miller regarding Zaremba's comments. Compl. ¶ 64. Under this component, Plaintiff must "hold an objectively reasonable belief, in good faith," that the activity he opposes is unlawful under the ADEA. See Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006) (interpreting Title VII's similarly constructed retaliation clause).

Defendant concedes for purposes of summary judgment that Plaintiff engaged in protected activity under the ADEA and the PHRA when he complained to Miller about Zaremba's comment and that Plaintiff suffered an adverse action when Defendant terminated his employment. Mot. Summ. J. 32. Defendant argues,

16

however, that Plaintiff fails to establish a causal connection between the protected activity and adverse action.

Taking the evidence of record in the light most favorable to Plaintiff, Plaintiff fails to establish a causal connection between the June 2008 protected activity and September 2009 adverse action. Plaintiff may show a causal connection by temporal proximity between the protected activity and adverse action, ongoing or intervening antagonism between the two events, or other direct or circumstantial evidence to support an inference of retaliation. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000). The period between the two events spans about fifteen months, which suggests there is little temporal proximity between the events. Furthermore, other evidence of record does not raise an inference of retaliation. Plaintiff and Miller appeared to resolve the issue of Zaremba's comments at the July 2008 sales conference. Zaremba's June 2009 comment does not expressly refer to Plaintiff's age or communicate a threat, and other evidence of record indicates that Plaintiff, on occasion, spoke with coworkers about his health. Thus, Zaremba's comment is not the sort of intervening antagonism that would support an inference of retaliation. And Plaintiff's claim that Miller provided "inconsistent" reasons for terminating Plaintiff because he referred to Plaintiff's performance issues at a Pennsylvania

Human Relations Committee hearing is without support. Indeed, Miller testified that Plaintiff had a history of performance issues even before Zaremba became his supervisor. Therefore, Plaintiff fails to establish a prima facie case of retaliation.

For the sake of completeness, however, the Court will consider the remaining stages of the McDonnell Douglas framework with respect to Plaintiff's discrimination and retaliation claims.

## 2.   Legitimate, Nondiscriminatory Reasons

Defendant successfully articulates legitimate, nondiscriminatory reasons for terminating Plaintiff. As reflected in Miller's September 4 termination letter, Defendant asserts it terminated Plaintiff because of his "disrespectful and abusive behavior towards management shortly before his termination, together with his inept handling of the Procacci [Brothers] account." Mot. Summ. J. 20. Specifically, Defendant points to the following telephone calls and e-mail message to support its proffered reasons: (1) Plaintiff's placing an upset customer on the phone with Miller in June or July of 2009; (2) Plaintiff's August 2009 telephone call to Crabill; (3) Plaintiff's August 2009 telephone call to Zaremba; and (4) Plaintiff's August 27 e-mail message to Zaremba, Miller, and Crabill. Furthermore, Defendant notes that the individuals who

18

decided to terminate Plaintiff, Miller (age: 65) and Paxton
(age: 70), were significantly older than Defendant, which tends
to show Defendant did not terminate Plaintiff based on his age.
Defendant, therefore, satisfied its burden to produce evidence
supporting the conclusion that it terminated Plaintiff for
legitimate, nondiscriminatory reasons. See Smith, 589 F.3d at
691-92.

3.   Pretext

Because Defendant proffered legitimate,
nondiscriminatory reasons for terminating Plaintiff, Plaintiff
must now show the proffered reasons are a pretext and
Defendant's true reason for terminating Plaintiff was because of
his age or opposition to unlawful age discrimination. Plaintiff
may defeat the Motion for Summary Judgment "by either (i)
discrediting the proffered reasons, either circumstantially or
directly, or (ii) adducing evidence, whether circumstantial or
direct, that discrimination was more likely than not a
motivating or determinative cause of the adverse employment
action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).
"[Plaintiff's] evidence rebutting [Defendant's] proffered
legitimate reasons must allow a factfinder reasonably to infer
that each of the employer's proffered non-discriminatory reasons
was either a post hoc fabrication or otherwise did not actually

19

motivate the employment action (that is, the proffered reason is a pretext)." Id. (citations omitted).[6] Finally, Plaintiff will not discredit Defendant's proffered reasons by showing they are "wrong or mistaken" but must, instead, "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Id. at 765 (citations omitted) (internal quotation marks omitted). Plaintiff shoulders the ultimate burden of persuasion to show but-for causation. See Smith, 589 F.3d at 690-91 (noting that, despite use of McDonnell Douglas framework, ultimate burden of persuasion to prove but-for causation in ADEA case remains on plaintiff).

Plaintiff disputes that he screamed at Crabill and Zaremba on the telephone and notes that the e-mail message he sent after the company shipped the under-count order to Procacci Brothers did not contain foul language, but instead expressed his frustration and identified an area where the company could improve its service. Indeed, Plaintiff's comments focused on

---

[6]     Plaintiff is not required to discredit each of Defendant's proffered reasons. See Fuentes, 32 F.3d at 764 n.7 ("We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder.").

providing his customers better service, a quality Defendant
values in its employees. See Kwik Lok Corporation Employee
Handbook, Customer Relations, Pl.'s Resp. Ex. C ("One of the
highest priorities at Kwik Lok Corporation is to help any
customer or potential customer."). Plaintiff further notes that
Defendant departed from the progressive discipline policy set
out in its employee handbook. See id. ("716 Progressive
Discipline"); see also Stewart v. Rutgers, State Univ., 120 F.3d
426, 434 (3d Cir. 1997) (quoting Vill. of Arlington Heights v.
Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977) ("Departures
from the normal procedural sequence also might afford evidence
that improper purposes are playing a role.")). And Plaintiff
points out that, in Miller's termination letter, Miller did not
refer to Plaintiff's alleged substandard performance, even
though Miller represented to the Pennsylvania Human Relations
Commission that his decision to terminate Plaintiff was based at
least in part on Plaintiff's performance.

Plaintiff fails to demonstrate weaknesses or
inconsistences in Defendant's proffered reasons such that a
reasonable factfinder could rationally find them unworthy of
credence. See Fuentes, 32 F.3d at 765. The evidence of record
indicates that Crabill called Miller demanding that Plaintiff be
fired for the way he handled the Procacci Brothers situation.
And whether Defendant ultimately agreed to make an exact

21

shipment to Procacci Brothers (and later failed to perform as
agreed) is immaterial to whether Defendant terminated Plaintiff
because of his age. Defendant terminated Plaintiff, in part,
because of his reaction to the alleged failure to ship an exact
count of product to Procacci Brothers. Whether Plaintiff was
correct that Defendant failed to perform as agreed is
immaterial. Perhaps Defendant's decision was wrong or misguided,
but the Court's job is not to second guess Defendant's
employment decisions. In other words, in ruling upon ADEA cases,
the Court does not act as a personnel or labor board empowered
to resolve workplace issues. Furthermore, that Defendant may
have departed from the progressive discipline policy set out in
Defendant's employee handbook does not support Plaintiff's
claims because there is no evidence of record that Defendant
treated Plaintiff differently from an employee similarly
situated. Finally, that Miller referred to Plaintiff's poor
performance during a Pennsylvania Human Relations Committee
hearing does not necessarily contradict the reasons Miller
provided for Plaintiff's termination in his letter. Even more,
such a reference does not create a genuine dispute of material
fact, especially when considered in the light of the dearth of
evidence suggesting Defendant terminated Plaintiff because of
his age or in retaliation for opposing unlawful age
discrimination. Therefore, Plaintiff fails to demonstrate

implausibilities in Defendant's proffered reasons such that a reasonable jury could rationally find those reasons unworthy of credence. Viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in Plaintiff's favor, Plaintiff fails to establish that Defendant terminated him because of his age or in retaliation for opposing unlawful age discrimination. Therefore, the Court will grant Defendant's Motion for Summary Judgment as to Plaintiff's claims of unlawful age discrimination and retaliation.

      B.    <u>Harassment</u>

        Defendant moves for summary judgment on Plaintiff's claims of harassment in violation of the ADEA and the PHRA. Defendant argues that there is insufficient evidence of record to establish Plaintiff was subjected to a hostile work environment. In response, Plaintiff withdrew his harassment claims. <u>See</u> Pl.'s Resp. 10 n.1. Therefore, the Court will grant the Motion for Summary Judgment as to Plaintiff's claims of harassment as unopposed. <u>See</u> <u>Seals v. City of Lancaster</u>, 553 F. Supp. 2d 427, 432-33 (E.D. Pa. 2008).

**V.    CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment. An appropriate order will follow.